**Pamela JOHNSON, Plaintiff,**

v.

**The WASHINGTON TIMES CORPORATION, et al., Defendants.**

**CA 01–0004 (CKK/JMF).**

United States District Court, District of Columbia.

June 18, 2002.

Michael Gerard Kane, Cashdan, Golden & Kane, P.L.L.C., Washington, DC, for plaintiff.

Allen Vern Farber, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Stephen Craig Leckar, Butera & Andrews, Washington, DC, for defendants.

Frederick Wilson Chockley, Baker & Hostetler, L.L.P., Washington, DC, for movant.

### MEMORANDUM OPINION

FACCIOLA, United States Magistrate Judge.

This case involves an effort by a Title VII plaintiff to force certain entities to identify whether certain persons claim membership in the Unification Church ("the Church"). Plaintiff alleges that The Washington Times

Corporation ("TWTC"), where she worked,[1] did not give her a raise but instead gave a raise to a member of the Unification Church. She further alleges that she was fired when she complained about this discrimination to the EEOC. She insists that she should be permitted to find out who, within the TWTC organization, is a member of the Unification Church and she has therefore issued subpoenas to entities that might have this membership information.

The subpoenaed entities resist any such disclosure.

In an attempt to find a middle ground, I proposed a solution that would have required defendant TWTC to collaborate with those subpoenaed entities who may have a list of church members. The latter would have identified for TWTC those persons whose names appear in a listing of church members. TWTC would then have created a second list identifying those persons who worked for them. As to each person on the list of church members, TWTC would then indicate the division, department, or section in which each person on the list worked.

TWTC would indicate whether any person who was fired was a church member or not and would provide documentation as to the firing. If a church member got a raise, TWTC would review the salary histories of all employees in that division to ascertain whether the raise given the church member was proportionally greater than the raise given any non-church member in that division or department. As to each department or division in which a church member worked, TWTC would also have to indicate whether anyone in that department or division received a raise, irrespective of church membership.

Most significantly, all of this information would have been provided anonymously. No one would ever have known the name of any church member. Church members would have been identified solely by a number.

The subpoenaed entities rejected my solution. They are understandably reluctant to provide any information about church membership. Ironically, in a country whose earliest European settlers fled religious persecution, there is an ugly history of religious intolerance, such as the expulsion of the Mormons from Nauvoo, the rise and unholy history of the Klu Klux Klan and its hatred of Catholics and Jews, all too persistent anti-Semitism, and the disgraceful bigotry that surfaced in the campaign of Al Smith for the Presidency. Fear of the consequences of the disclosure of one's religious affiliation may be palpable and real at a certain point in history. There is, therefore, in my view, implicit in the First Amendment's guarantee of religious freedom, the right to chose whether or not to disclose one's religious affiliation lest forced disclosure inhibit the free exercise of one's faith. I have to believe that, when a person provides her name and address to a church that has asked her to become a member, she reasonably expects that her name and address will be disclosed to other church members, used by the church to invite her to other church functions, and used to solicit her contribution to the church's financial welfare. There is nothing I know of in the American experience that suggests to me that by giving one's name and address to a church one thereby agrees to the publication of one's religious affiliation to the whole world.

Plaintiff is dismissive of the concern that disclosure of membership in the Unification Church would discourage people from joining or remaining members of the Church. But, plaintiff gives me no reason to doubt the word of Church officials and of a distinguished religious scholar (unaffiliated with the Church) that the Church is controversial

---

1.  Plaintiff served a subpoena upon the Holy Spirit Association for the Unification of World Christianity. The Holy Spirit Association is said to be "the formal legal name in the United States for the Unification Church, the religious entity founded in Korea in 1954." *Memorandum of Points and Authorities in Support of Motion to Quash and/or for Protective Order* at 1. News World Communications, Inc. owns and publishes The Washington Times Newspaper. News World Communications is a subsidiary of One Up Enterprises Inc., which is in turn, a subsidiary of Unification Church International. *Plaintiff Pamela Johnson's Opposition to the Holy Spirit Association for the Unification of World Christianity's Motion to Quash/and or for Protective Order,* Exhibit 5.

and that its members have encountered bigotry and prejudice. Frankly, I hardly need the information. I have heard supposedly well-educated people, who should know better, speak of the members of the Church pejoratively. We all hope for a day when such intolerance will disappear but, until it does, I, for one, cannot honestly dismiss the concerns the Church has that the disclosure of its members will harm them in their professional and personal lives. As a judge, I cannot ignore what I know as a man—that, in certain mouths, the word "Moonie" is hardly a term of endearment or respect.

■ I am so firmly convinced of the merits of the principle that one's religious affiliation is one's own business that I have to decided to walk with the Church one more mile. Under my attached order, the law firm that represents TWTC will appoint a person, identified in my order as "the designee," who will be the only person who will ever see the data that indicates which members of the Church work for TWTC. The designee will summarize the results of the examination of the data for me anonymously, using numbers instead of names. This way, I will not even know the names of Church members who work at TWTC. Thus, the Church will be able to maintain its church members' anonymity throughout the discovery process and TWTC will be protected from not learning what it does not want to know: the names of the members of the Church who work for TWTC.

The question then becomes what will happen once I review the documents and the easiest answer is the one judges love: I'll cross that bridge when I come to it. To be less glib, if I find that the data shows absolutely no connection between church membership and employment decisions, the matter will end there with my returning the data to the parties who provided it or destroying it without plaintiff ever seeing it. If, on the other hand, a pattern does emerge, I may ask the defendants to concur with my findings (e.g., in 1997 a church member in circulation got a raise and a non-church member

with a similar job did not). I would only seek this concurrence with the understanding that, by so stipulating, defendants in no way concede the relevance of the information to plaintiff's case. While I cannot be certain, I may be able to shape relief that would never disclose what I learned, but would nevertheless provide plaintiff with the same information she would have secured had her counsel seen the documents themselves.

I appreciate that both sides may object to my solution. I can only hope that, like any settlement, it displeases both of them equally.

As for plaintiff, she may justly accuse me of resurrecting the bad old days before the Federal Rules of Civil Procedure when a party had to show good cause to get discovery. She may also say that I am improperly intruding upon the discovery process that generally permits a party's counsel to see what is produced even though its public disclosure is prohibited by a protective order. Perhaps that is true, but my discretionary power over discovery is broad [2] and this is not the first case, nor will it be the last, where a party was obliged to make a certain showing before securing additional discovery.

For their part, defendants could complain that even the limited, anonymous relief I am giving plaintiff is more than she should get. They see this case as a simple Title VII case involving a five-person department of the newspaper and argue that discovery as to any other department or division of the newspaper is impermissible because plaintiff has not pled an institution wide pattern of practice and has not retained an expert witness to study the statistical relationship between church membership and employment decisions. In their view, burdening them with even the slight obligations I am imposing is beyond the discovery plaintiff should be permitted.

■ In supervising discovery in many Title VII cases, I have grown increasingly dissatisfied with hard and fast rules that purport to limit discovery as to scope, time

2. *Bregman v. District of Columbia,* 182 F.R.D. 352, 360 n. 5 and authorities cited therein

(D.D.C.1998).

or geography. Insisting that discovery should be limited to five years before the discriminatory act or to the subdivision where plaintiff worked are often arbitrary excuses for refusing to do a more careful analysis. The more appropriate starting point is the notion that in general, plaintiffs have a right to explore discriminatory acts similar in motivation to the ones complained of, if it is likely that a finder of fact would conclude that the other acts of discrimination are probative of intention or motivation. *White v. United States Catholic Conference*, 1998 WL 429842, at *3, *5 (D.D.C. May 22, 1998). If the person who discriminated against plaintiff also discriminated against other persons, then the inference that he acted with a similar motivation on both occasions may well be drawn. *See e.g., Miller v. Poretsky*, 595 F.2d 780, 788 (D.C.Cir.1978)(Robinson, J., concurring).

Discovery of other discriminatory acts, performed by others is a function of the permissibility of drawing from those acts the inference that whoever performed the other acts of discrimination had a similar motivation to the persons who discriminated against the plaintiff. In that analysis, the identity of the motivation is crucial. *White*, 1998 WL 429842, at *5. If the motivation is identical, then the permissibility of the drawing of the inference is a function of time and distance. Discrimination by a trucking company against a truck driver in Cincinnati in 1995 is hardly probative of an intent to discriminate against another truck driver in Memphis in 2000. On the other hand, that company's not hiring a woman to be a truck driver in 2002 may well be relevant when a second woman is rejected by the Memphis office in 2002. In the latter instance, if the person who rejected the first woman acted with a discriminatory intent, that act may well be admissible as bearing on the intent of whoever rejected the second. Organizations can only act through their agents. Similar acts may be as admissible as bearing on the motive with which the organization acted when confronted with a similar situation as similar acts would be admissible if performed with the same intent by an individual.

In this case, we are dealing with a single organization's acts over a narrow period of time. The acts plaintiff is searching for will be identical in motivation and nature to the discriminatory acts of which plaintiff complains if they exist. To deny her that discovery would be to deny her the right to try to establish that the motivation and intent between truly similar acts were not a product of coincidence but the result of an intent to favor church members over non-church members. In my view, she unquestionably has the right to get that discovery if she is to pursue this lawsuit; comparing similar situations to see if they are the product of coincidence or discriminatory intent is at the heart of Title VII litigation.

Moreover, there appears to be a significant connection between the newspaper and the Church; plaintiff seems to correctly allege that the Church, through ownership of subsidiaries, and in particular New World Communications owns TWTC. *Plaintiff's Motion to Enforce Subpoena*, Exhibit 5. It also appears that persons who are members of the Church are in positions of authority in the newspaper such as the defendant Dong Joo. According to Dunn & Bradstreet, Dong Joo is the President of Unification Church International and of New World Communications, the publication that owns and publishes TWTC. *Id.*, Exhibit 6; *See http://www.rickross.com/reference/unif/unif105.html* (Joo identified as President of New World Communications upon New World's purchase of UPI).

I want to stress the fact that we are dealing with an allegation of discrimination committed by people who share a theological and philosophical perspective. This is not to say that they are, therefore, bigots, but to say that there is nothing in human experience that compels the conclusion that it is inconceivable or impossible that these people may have favored persons who share their views. Such favoring may be benevolent and understandable, particularly in a diverse, polyglot, pluralistic society like America; merchants do not buy ads in church bulletins for eleemosynary purposes. Yet, I would be saying such favoring never happens in American society if I did not even permit the

limited discovery I am permitting. I cannot say that and remain faithful to my own experience living in that society.

In this context, the radical difference between my role and Judge Kollar–Kotelly's bears emphasis. She is the gate keeper of what the jury hears and she may well decide that the acts claimed to be similar are ·not, that they raise collateral issues such as the accuracy of the indications of Church membership, and that their tendency to prejudice the defendant unfairly overwhelms their probative force. Fed.R.Evid. 404. On the other hand, my job is to supervise discovery so that plaintiff may collect the information she needs to make the argument that the other discriminatory acts are similar enough to permit their admission. To pre-judge the case and say that it is impossible for the plaintiff to find any admissible evidence is to impinge upon Judge Kollar–Kotelly's function and ignore the fact that my role is to structure plaintiff's ability to see if such evidence exists.

Finally, I hasten to add that the discovery I am permitting deals with specific instances of potentially differing treatment. The mere fact that gross numbers of Church members are employed at TWTC is simply not probative of any issue in this case. To suggest that because Church members were a substantial percentage of the working force, discrimination against non-Church members was more likely is to assume what needs to be proved and is (ironically) to engage in the very bigotry that Title VII prohibits.

I will therefore order only the discovery outlined in the attached order and deny plaintiff any other relief.

## ORDER

Pursuant to the accompanying Memorandum Opinion, it is, hereby,

**ORDERED** that counsel for The Washington Times Corporation ("TWTC") designate one individual, employed by counsel, who need not be a lawyer, will be responsible for conducting the discovery in this case. Such individual, called "the designee," shall not disclose what that person learns fulfilling the obligations of this Order to any one without the written direction of the Court. The designee will sign this Order as an indication of his or her understanding of the responsibilities being assumed. Discovery in this case will proceed as follows:

1. The subpoenaed entities shall produce all documents, lists or file (including the book called "Connections") that contain or tend to disclose the names of members of the Unification Church in the period of January 1, 1996 through December 31, 1998. The subpoenaed entities will give these documents to the designee.

2. The designee, having been given this information, will then examine the personnel records of TWTC to ascertain whether any person who appears to have been a member of the Church in the period of January 1, 1996 through December 31, 1998 was employed by TWTC in the same period. If the designee ascertains that it appears that a member of the Church worked for TWTC, then the designee will preserve the personnel or other file pertaining to that individual within the TWTC files and the information provided by the Church as to that person. Such persons will then become known as "candidates for comparison."

3. As to each candidate for comparison, the designee will ascertain from the TWTC files whether such person received a raise in the period of January 1, 1996 through December 31, 1998. If such person did not, the designee will have no further responsibility as to that person but will preserve the records pertaining to him or her and await this court's order.

4. If the candidate for comparison did receive a raise, the designee will then identify that individual's division, department, or section and TWTC will provide the designee with a list of all other TWTC employees working within those same divisions, departments, or sections, and the personnel files of each such employee.

5. The designee will examine those personnel files to ascertain whether any

TWTC employee in that division, department, or section received a raise in the period of January 1, 1996 through December 31, 1998.

6. If the designee ascertains that the candidate for comparison got a raise but another person in the candidate's division did not, the designee will preserve the personnel files of the candidate for comparison and of all other members of the candidate's division, department, or section.

7. From the files thus collected, pursuant to paragraph 6, the designee will prepare a chart for my inspection that graphically and anonymously summarizes the information in the files pertaining to raises. The court suggests the following chart as a means of fulfilling this obligation:

| Employee # | Church member (yes or no) | Division, Department or Section | Date of Raise | Amount |
|---|---|---|---|---|
| 1 | Yes | Circulation | 1/5/97 | 2000 |
| 2 | No | Circulation | None | |
| 3 | No | Circulation | 3/1/97 | 1000 |

---

It is further, hereby,

**ORDERED** that the Motions of the Holy Spirit Association to Quash Subpoena [# 16–1] and for a Protective Order [# 16–2], the Motions by plaintiff to Enforce the James Borer [# 18–1], the Holy Spirit Association [# 19–1], the Les Reddin [# 20–1], and the Unification Church [# 21–1] Subpoenas, the Motion by the Unification Church for a Protective Order [# 28–1], and the Motion by plaintiff to Compel Defendants to Respond to Her Discovery Requests [# 37–1] are

**GRANTED** in part and **DENIED** in part.

**SO ORDERED.**